JIANGSU JIASHENG PHOTO-
VOLTAIC TECHNOLOGY
CO., LTD., Plaintiff,

v.

UNITED STATES, Defendant.

Slip Op. 15–113
Consol. Court No. 13–00012 [1]

United States Court of
International Trade.

October 5, 2015

1. This action is consolidated with *SolarWorld Indus. Am., Inc. v. United States*, Ct. No. 13–00006. Order, June 12, 2013,

Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein LLP, of Washington, DC, for SolarWorld Americas, Inc.

L. Misha Preheim, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. Also on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel was Rebecca Cantu, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

## OPINION

Pogue, Senior Judge:

This consolidated action arises from the United States Department of Commerce's ("Commerce") antidumping investigation of crystalline silicon photovoltaic cells from the People's Republic of China ("China").[2]

Before the court is Commerce's redetermination, pursuant to remand, of the antidumping cash deposit rates for four specific producers/exporters of merchandise subject to the investigation.[3] On remand, Commerce found that three of these four respondents have not shown that their production and export operations are free from government control, and so determined to assign to those respondents the China-wide rate.[4] This portion of the *Remand Results* is not subject to challenge.[5] With respect to the remaining respondent—Ningbo ETDZ Holdings Limited ("Ningbo ETDZ")—however, Commerce found that this company sufficiently demonstrated its eligibility for a rate separate from the China-wide entity.[6] Defendant–Intervenor SolarWorld Americas, Inc. ("SolarWorld")—a petitioner in the underlying antidumping investigation—now

**2.** *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed.Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final determination of sales at less than fair value, and affirmative final determination of critical circumstances, in part) (*"Final Results"*) and accompanying Issues & Decision Mem., A–570–979, Investigation (Oct. 9, 2012) (*"I & D Mem."*).

**3.** *See* Final Results of Redetermination Pursuant to Ct. Order, ECF Nos. (conf.version) & 98–1 (pub.version) (*"Remand Results"*); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1343, 1351 (2014) (*"SolarWorld I"*) (granting Commerce's request for voluntary remand with respect to these four specific respondents, and remanding the *Final Results* solely with regard to "the separate rate eligibility of the four respondents named in Commerce's request"). Although the most relevant background is summarized below, familiarity with the history of this litigation is presumed. The court's prior opinion—referred to here as SolarWorld I—affirmed the *Final Results* of this antidumping investigation against all challenges presented in this consolidated action, other than the separate rate eligibility of these

four respondents. *SolarWorld I*, 28 F.Supp.3d at 1351.

**4.** *Remand Results*, ECF Nos. & 98–1, at 8–11. *See* Background, *infra*, for relevant context.

**5.** None of these three respondents filed comments with this Court regarding the *Remand Results, see* ECF Nos. 97 *et seq.*, although one of these companies—Sumec Hardware & Tools Co., Ltd. ("Sumec Hardware")—unsuccessfully sought to intervene in this action, out of time, in order to challenge Commerce's *Remand Results. See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, —— CIT ——, 72 F.Supp.3d 1378 (2015) (denying Sumec Hardware's motion to intervene in this action more than two years past the 30 day time limit provided by USCIT Rule 24(a)(3)). Because Sumec Hardware failed to demonstrate good cause for the significant tardiness of its attempted intervention, the court denied Sumec Hardware's motion, and consequently no opinion is expressed herein with regard to Sumec Hardware's arguments against the *Remand Results. See. id.* at 1382–83 (explaining the court's reasoning).

**6.** *Remand Results*, ECF Nos. & 98–1, at 12–13.

challenges this latter determination.[7]

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[8] and 28 U.S.C. § 1581(c) (2012).

Because Commerce's redetermination is based on a reasonable reading of the record evidence, as explained below, the *Remand Results* are sustained.

## BACKGROUND

■ When investigating merchandise from a country that Commerce considers to be a non-market economy ("NME"), including China,[9] Commerce employs a rebuttable presumption that the export-related decision-making of all enterprises operating within the NME is controlled by the government (whether at the central, provincial, or local level).[10] "Consistent with this presumption, it is [Commerce]'s policy to assign all exporters of the merchandise subject to review in an NME country a single [country-wide] rate unless an exporter can affirmatively demonstrate an absence of government control, both in

law (*de jure*) and in fact (de facto), with respect to exports,"[11] and thereby demonstrate its eligibility for a "separate rate."[12]

■ As this Court has previously explained,

Commerce's essential inquiry with regard to whether a particular respondent's circumstances warrant the grant of separate-rate status focuses on whether, "considering the totality of circumstances," the respondents in question "had sufficient independence in their export pricing decisions from government control to qualify for separate rates." To that end, the relevant *de jure* autonomy "can be demonstrated by reference to legislation and other governmental measures that decentralize control," and the relevant *de facto* autonomy "can be established by evidence that [the] exporter sets its prices independently of the government and of other exporters, and that [the] exporter keeps the proceeds of its sales." In both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence.[13]

---

7. Def.-Intervenor SolarWorld Americas, Inc.'s Comments on Final Results of Redetermination Pursuant to Ct. Order, ECF Nos. 104 (conf.version) & 105 (pub.version) ("SolarWorld's Br."). Ningbo ETDZ itself did not file any commentary regarding the *Remand Results*. *See* ECF Nos. 97 *et seq.*

8. Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S.Code, 2012 edition.

9. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* 76, Fed.Reg. 70,960, 70,962 (Dep't Commerce Nov. 16, 2011) (initiation of antidumping duty investigation) ("The presumption of NME status for [China] has not been revoked by [Commerce] and, therefore, in accordance with [19 U.S.C. § 1677(18)(C)(i)], remains in effect for purposes of the initiation of this investigation.").

10. *See SolarWorld I,* 28 F.Supp.3d at 1323–24 & nn. 12–13 (providing relevant background and authorities); *Remand Results,* ECF Nos. & 98–1, at 2–3, 28.

11. *Remand Results,* ECF Nos. & 98–1, at 3 (citations omitted); *see SolarWorld I,* 28 F.Supp.3d at 1338 & n. 103 (providing relevant citations).

12. *See SolarWorld I,* 28 F.Supp.3d at 1324 & n. 13.

13. *Id.* at 1339 (emphasis omitted) (quoting *Certain Cut–to–Length Carbon Steel Plate from Ukraine,* 62 Fed.Reg. 61,754, 61,759 (Dep't Commerce Nov. 19, 1997) (notice of final determination of sales at less than fair value) and *Sigma Corp. v. United States,* 117 F.3d 1401, 1405 (Fed.Cir.1997) (citation omitted), respectively; and citing *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1520 (Fed.Cir.

Here, recognizing that "within the NME entity, companies exist which are independent from government control to such an extent that they can independently conduct export activities,"[14] Commerce granted a number of separate-rate applications during its investigation, finding that "the evidence placed on the record of this investigation by [these respondents] demonstrates both *de jure* and *de facto* absence of government control with respect to each company's respective exports of the merchandise under investigation."[15]

■ In the course of this litigation, however, Commerce requested and was granted a voluntary remand to reevaluate the evidence and reconsider the separate rate eligibility of four separate-rate recipients whose rates had been challenged by SolarWorld.[16] Commerce's basis for the remand request was a concern for consistency with the agency's approach to similar issues in antidumping proceedings involving diamond sawblades from China.[17] Specifically, as a result of litigation challenging Commerce's separate rate determinations in the diamond sawblades proceedings, Commerce has clarified its practice with regard to evaluating NME companies' *de facto* independence from government control.[18] This revised practice, which was sustained by this Court and subsequently affirmed by the Court of Appeals,[19] holds that "where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter [or producer],"[20] such majority ownership holding "in and of itself" precludes a finding of *de facto* autonomy.[21]

Applying this clarified approach on remand, Commerce reconsidered the separate rate eligibility of the four respondents covered by the remand order.[22] As a result, Commerce found that three of these respondents were no longer eligible for a separate rate, but that the remaining respondent—Ningbo ETDZ—continued to so qualify.[23] While none of the

1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation omitted)).

14. *I & D Mem.* cmt. 6 at 26 (citation omitted).

15. *Final Results*, 77 Fed.Reg. at 63,794.

16. *See SolarWorld I*, 28 F.Supp.3d at 1340–41.

17. *See id.* at 1340 n. 113; *Remand Results*, ECF Nos. & 98–1, at 6–7.

18. *See Remand Results*, ECF Nos. & 98–1, at 7, 17.

19. *See Advanced Tech. & Materials Co. v. United States*, — CIT —, 938 F.Supp.2d 1342 (2013), *aff'd*, 581 Fed.Appx. 900 (Fed.Cir. 2014).

20. *Remand Results*, ECF Nos. & 98–1, at 7.

21. *See id.* at 7–11; *see also id.* at 17 ("[W]here a government entity holds a majority owner-ship share, either directly or indirectly, in the respondent exporter, the majority ownership holding, in and of itself, means that the government exercises, or has the potential to exercise, control over the company's operations generally, rendering the company ineligible for a separate rate.") (citing Prelim. Decision Mem., *Carbon and Certain Alloy Steel Wire Rod from the People's Republic of China*, A–570–012, Investigation (Aug. 29, 2014) (adopted in 79 Fed.Reg. 53,169 (Dep't Commerce Sept. 8, 2014) (preliminary determination of sales at less than fair value and preliminary affirmative determination of critical circumstances, in part)) (*"Wire Rod from China"*) at 5–9 (unchanged in 79 Fed.Reg. 68,860 (Dep't Commerce Nov. 19, 2014) (final determination of sales at less than fair value and final affirmative determination of critical circumstances, in part))).

22. *See Remand Results*, ECF Nos. & 98–1, at 1–2; *SolarWorld I*, 28 F.Supp.3d at 1340–41.

23. *Remand Results*, ECF Nos. & 98–1, at 1–2.

affected respondents filed comments with the court in response to Commerce's *Remand Results*,[24] SolarWorld challenges Commerce's determination that Ningbo ETDZ is eligible for a separate rate in this investigation.[25] Accordingly, the sole question before the court is whether Commerce reasonably determined that Ningbo ETDZ operated with sufficient autonomy during the period of investigation to qualify for a rate separate from the country-wide entity, notwithstanding the presumption of government control.[26] After a brief statement of the applicable standard of review, this matter is discussed in detail below.

## STANDARD OF REVIEW

The court will sustain Commerce's antidumping determinations on remand if they are supported by substantial evidence and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed.Cir.2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus the substantial evidence standard of review can be roughly translated to mean "is the determination unreasonable?" *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1351 (Fed.Cir.2006) (quotation marks, alteration marks, and citation omitted). In this context, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) (citations omitted).[27]

## DISCUSSION

SolarWorld's challenge relies on the record evidence concerning the extent to which a wholly state-owned company exercised its ownership stake in Ningbo ETDZ to affect the selection of certain high-level management personnel.[28] Specifically, SolarWorld argues that in light of this evidence, "Commerce has not provided adequate explanation or support" for its determination that Ningbo ETDZ is eligible for a separate rate in this investigation.[29]

First, SolarWorld argues that, on the facts presented here, a twenty percent ownership interest in the respondent company held by a wholly state-owned enterprise should in itself constitute conclusive evidence of *de facto* government control, particularly where (as here) the next largest shareholder owned only twelve per-

24. *See* ECF Nos. 97 *et seq.*; *see also supra* note 5 (discussing Sumec Hardware's unsuccessful attempt to file comments).

25. SolarWorld's Br., ECF Nos. 104 & 105, at 5–9.

26. *See Remand Results*, ECF Nos. & 98–1, at 12–13 (explaining Commerce's evidentiary findings and consequent conclusions with regard to Ningbo ETDZ); *id.* at 26–27 (addressing SolarWorld's challenges to these determinations); SolarWorld's Br., ECF Nos. 104 & 105, at 5–9.

27. *See also, e.g., Technoimportexport, UCF Am. Inc. v. United States*, 16 CIT 13, 18, 783 F.Supp. 1401, 1406 (1992) ("When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly.").

28. *See* SolarWorld's Br., ECF Nos. 104 & 105, at 5–9.

29. *Id.* at 9.

cent, and no other shareholder owned more than five percent.[30] SolarWorld argues that "a reasonable understanding of what constitutes 'control' in the corporate context" should be "instruct[ed]" by regulations promulgated by the Securities and Exchange Commission ("SEC")—"a U.S. government agency with significant experience in the regulation of corporations"— using twenty percent "as the ownership threshold for the point at which an investor is no longer considered a 'passive investor,' triggering various reporting requirements."[31] But as Commerce points out,[32] and as SolarWorld acknowledges,[33] these SEC regulations do not apply to Commerce's antidumping determinations. On the contrary, Commerce has developed its own, different test for the threshold ownership stake at which the ownership percentage in itself constitutes conclusive evidence of *de facto* control. For Commerce, such conclusive evidence is "where a government entity holds *a majority ownership share*, either directly or indirectly, in the respondent exporter."[34] Here, the state-owned entity did not hold a majority ownership share,[35] and it was not unreasonable for the agency to determine not to rely on regulations promulgated by an unrelated agency in an entirely different context.

Next, SolarWorld also argues that Commerce unreasonably found that Ningbo ETDZ rebutted the presumption of *de facto* government control because the wholly state-owned company holding the twenty percent share was involved in the selection of certain of Ningbo ETDZ's high-level management personnel.[36] Specifically, the state-owned shareholder recommended [[ ]] to serve as the Chairman of the Board of Ningbo ETDZ,[37] who was then elected

**30.** *See id.* at 6 (relying on *Remand Results,* ECF Nos. & 98–1, at 12 (Commerce's finding that [[ ]], "which is indirectly a wholly state-owned company, owned the largest percentage of shares of Ningbo ETDZ of any shareholder," because it owned twenty percent of Ningbo ETDZ, with the next largest shareholder being "an individual that controls 12 percent of the total shares" and all remaining shareholders being "individual[s] owning [no] more than five percent of Ningbo ETDZ's total shares") (citing [Ningbo ETDZ's] Separate Rate Appl., *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* A570–979, Investigation (Jan. 14, 2012), *reproduced in* Def.'s Suppl. App. of Rec. Docs., ECF Nos. 117 (conf.version) & 118 (pub.version) ("Def.'s Suppl. App.") at Tab 1 (*"Ningbo ETDZ SRA"*) at 13 & Exs. 5 & 10)).

**31.** SolarWorld's Br., ECF Nos. 104 & 105, at 6 (citing 17 C.F.R. § 240.13d–1 (triggering reporting requirements at twenty percent ownership and above); *id.* at § 210.3–09 (using twenty percent ownership as the threshold for the agency's "significant subsidiary" test)).

**32.** *Remand Results,* ECF Nos. & 98–1, at 27 ("[Commerce] does not find Petitioner's argu-

ment regarding the SEC regulations to be persuasive[ ] [because these] are SEC regulations and do not apply to [Commerce]'s administration of the antidumping law or its separate rate practice.").

**33.** SolarWorld's Br., ECF Nos. 104 & 105, at 6 (quoting *Remand Results,* ECF Nos. & 98–1, at 27).

**34.** *Remand Results,* ECF Nos. & 98–1, at 28 (emphasis added); *see also id.* at 7 (citing *Wire Rod from China, supra* note 21, at 5–9).

**35.** *See supra note* 30 (quoting relevant factual findings).

**36.** SolarWorld's Br., ECF Nos. 104 & 105, at 6–9.

**37.** *Id.* at 6–7 (relying on *Remand Results,* ECF Nos. & 98–1, at 12 ("Ningbo ETDZ's articles of association state that [the state-owned shareholder] selects the chairman of the board of directors of Ningbo ETDZ. [[ ]] serves as both the Chairman of the Board of Ningbo ETDZ and [[ ]].") (citing, respectively, [Ningbo ETDZ's] Separate Rate Appl.—2d Suppl. Questionnaire Resp., *Crystalline Silicon Photovoltaic Cells, Whether or Not Assem-*

by the board members.[38] In addition, the state-owned shareholder also nominated Ningbo ETDZ's [[ ]].[39]

■ In response, Commerce emphasizes other record evidence, which indicates that other than the Chairman of the Board and the [[ ]], the remainder of Ningbo ETDZ's management personnel selections—and in particular the selection of personnel with primary control over Ningbo ETDZ's production and business operations—were *not* in any way influenced by the government.[40] Specifically, the record indicates that, with the excep-

tion of the chairman,[41] all of Ningbo ETDZ's board members, including the board's first vice director, were recommended by shareholders other than the state-owned entity, and appointed by a vote of all of the shareholders.[42] Moreover, the board's first vice director is also Ningbo ETDZ's general manager, as well as the company's second largest shareholder,[43] and Commerce found that it is this individual, rather than the state-owned shareholder, that "has the primary responsibilities associated with taking charge of Ningbo ETDZ's production and business operations."[44] This first vice di-

---

*bled into Modules, from the People's Republic of China*, A-570-979, Investigation (May 1, 2012), *reproduced in* Def.'s Suppl. App., ECF Nos. 117-1 & 118-1 at Tab 2 (*"Ningbo ETDZ 2d SRA Resp."*) at Ex. 4 (Articles of Association, Art. 94); and *Ningbo ETDZ SRA,* ECF Nos. 117-1 & 118-1 at Tab 1, at Exs. 4 & 12; *Ningbo ETDZ 2d SRA Resp.* at Ex. 1)). In the *Remand Results,* Commerce incorrectly characterizes the evidence to suggest that "Ningbo ETDZ's articles of association state that [the state-owned shareholder] *selects* the chairman of the board of directors of Ningbo ETDZ," ECF Nos. 97-1 & 98-1, at 12 (emphasis added) (citing *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4 (Articles of Association, Art. 94))—in fact the articles state that "[[ ]]." *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4 (Articles of Association, Art. 94) (emphasis added); *see also Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at 5 ("The chairman is [[ ]] and *elected* by the board members.") (emphasis added).

38. *See Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at 5 ("The chairman is . . . elected by the board members.").

39. *Remand Results,* ECF Nos. & 98-1, at 12 (citing *Ningbo ETDZ SRA,* ECF Nos. 117-1 & 118-1 at Tab 1, at Ex. 12).

40. *Id.* at 12-13, 27.

41. *See supra* note 37 (referencing relevant factual findings regarding the chairman).

42. *Remand Results,* ECF Nos. & 98-1, at 12 (emphasizing record evidence indicating that

[[ ]], the first vice director of Ningbo ETDZ's board, was recommended by shareholders other than the state-owned shareholder and appointed by vote of all the shareholders) (citing *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at 5); *id.* at 13 ("The record also indicates that the remaining three of Ningbo ETDZ's five board directors [after accounting for the first vice director and the chairman] are recommended by shareholders other than the state-owned company and appointed by vote of all the shareholders.") (citing *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at 5).

43. *Id.* at 12-13 ("[T]he record indicates that the second largest shareholder, [[ ]], is the first vice-director of Ningbo ETDZ's board. . . . [[ ]] is also the general manager of Ningbo ETDZ.") (citing *Ningbo ETDZ SRA,* ECF Nos. 117-1 & 118-1 at Tab 1, at Ex. 12; *Ningbo ETDZ 2d SRA* Resp., ECF Nos. 117-1 & 118-1 at Tab 2, at 5).

44. *Id.* at 13, 26 (citing *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4 (Articles of Association, Art. 116)); *see also id.* at 13 ("As general manager of Ningbo ETDZ, [[ ]] has significant responsibilities in managing and directing the operations of the company.") (citing *Ningbo ETDZ 2d SRA Resp.,* ECF Nos. 117-1 & 118-1 at Tab 2, at Ex. 4 (Articles of Association, Art. 116)); *id.* at 26 ("The record indicates that the second largest shareholder, [[ ]], rather than the [state-owned] shareholder, is in a position to control, and does control, the operations of Ningbo ETDZ."); *see Ningbo ETDZ 2d SRA*

rector and general manager—who has no apparent relationship with the government [45]—also nominated [[ ]], as well as Ningbo ETDZ's [[ ]], who also comprise two of Ningbo ETDZ's remaining three board members (appointed by a vote of all the shareholders).[46] Based on this evidence, Commerce concluded that Ningbo ETDZ's non-governmental general manager, "rather than the [state-owned] shareholder, is in a position to control, and does control, the operations of Ningbo ETDZ."[47] Accordingly, the agency determined that, because the evidence indicates that "the Government of China [has] little ability to indirectly exercise control over Ningbo ETDZ's operations, including its export decisions," Ningbo ETDZ has "satisfie[d] the criteria demonstrating an absence of *de facto* government control over export activities."[48].

On the evidence presented, Commerce's conclusion is not unreasonable. It is undisputed that the individual who was Ningbo ETDZ's second largest shareholder, first vice director of the board, and general manager during the period of investigation held no apparent ties to the government, and wielded at least some amount of control over the company's production and export operations.[49] The essence of the dispute here regards the relative weight placed by the agency on this evidence, as well as the additional evidence that (unlike the other three respondents whose separate rate status was revoked on remand [50]) Ningbo ETDZ's state-owned shareholder neither controlled a majority of Ningbo ETDZ's shares nor appointed a majority of its board directors.[51] While Commerce determined that this evidence of decision-making autonomy outweighs the suggestion of poten-

*Resp.*, ECF Nos. 117–1 & 118–1 at Tab 2, at Ex. 4 (Articles of Association, Art. 116) (providing that [[ ]] ).

**45.** *See Remand Results*, ECF Nos. & 98–1, at 13 ("The record does not include any information indicating that [the general manager and first vice director of Ningbo ETDZ's board] has a relationship with [the state-owned shareholder] other than that they are both shareholders of Ningbo ETDZ and [this individual] is employed by Ningbo ETDZ.").

**46.** *Id.* ("[[ ]] nominated [[ ]], and nominated [[ ]]. The record also indicates that the remaining three of Ningbo ETDZ's five board directors are recommended by shareholders other than [[ ]] and appointed by vote of all the shareholders. One of the [[ ]] and [[ ]] are also directors of the board.") (citing *Ningbo ETDZ SRA*, ECF Nos. 117–1 & 118–1 at Tab 1, at Ex. 12; *Ningbo ETDZ 2d SRA Resp.*, ECF Nos. 117–1 & 118–1 at Tab 2, at 5).

**47.** *Id.* at 26.

**48.** *Id.* at 13.

**49.** *See Remand Results*, ECF Nos. & 98–1, at 12–13, 26–27; *supra* note 44 (quoting relevant

record evidence); SolarWorld's Br., ECF Nos. 104 & 105, at 8–9 (citing *Remand Results*, ECF Nos. & 98–1, at 12–13, 26–27, and not disputing this evidence, while arguing that Commerce should not have given it as much weight as the agency did).

**50.** *See Remand Results*, ECF Nos. & 98–1, at 8 ("[T]he record indicates that [[ ]] is a wholly state-owned company, which, through its group companies, owns and controls a majority of the shares of Tianwei New Energy."); *id.* at 9 ("[[ ]] is a wholly state-owned company which owns and controls a majority of the shares of Dongfang Electric."); *id.* at 27 ("[T]he [state-owned] shareholder of Sumec Hardware and the [[employees of the state-owned shareholder]] own approximately [[ ]] percent of that company's shares, and appoint [[ ]] board directors.").

**51.** *See id.* at 27; SolarWorld's Br., ECF Nos. 104 & 105, at 5–9 (arguing that this evidence does not outweigh "the significant evidence of control" provided by the facts that the state-owned shareholder owns 20 percent of Ningbo ETDZ's total shares and that this state-owned shareholder appointed Ningbo ETDZ's Chairman of the Board and [[ ]] ).

tial for government control evidenced by the state-owned shareholder's recommendation of Ningbo ETDZ's elected Chairman of the Board and [[ ]],[52] SolarWorld argues that the latter evidence should outweigh the former.[53] But "[i]t is not for the courts to reweigh the evidence before the agency,"[54] and a "court may [not] displace the [agency's] choice between two fairly conflicting views," even if a reasonable person could also have justifiably made a different choice.[55]

Here, Commerce's weighing of the evidence to conclude that Ningbo ETDZ's non-governmental general manager, rather than the state-owned shareholder, "is in a position to, control, and does control, the operations of Ningbo ETDZ"[56] comports with a reasonable reading of the record,[57] even if a reasonable person could have also concluded otherwise. SolarWorld neither challenges any of Commerce's factual findings nor points to any evidence that Commerce did not consider and weigh in reaching its determination.[58] On the record presented, Commerce's inferences are not unreasonable.[59]

Accordingly, Commerce's determination that "Ningbo ETDZ satisfies the criteria demonstrating an absence of *de facto* gov-

---

**52.** *See Remand Results*, ECF Nos. & 98–1, at 12–13, 26–27.

**53.** *See* SolarWorld's Br., ECF Nos. 104 & 105, at 9.

**54.** *SolarWorld I*, 28 F.Supp.3d at 1323 (quoting *Henry v. Dep't of the Navy*, 902 F.2d 949, 951 (Fed.Cir.1990) (alteration marks omitted)).

**55.** *Univ. Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**56.** *Remand Results*, ECF Nos. & 98–1, at 26.

**57.** *See supra* note 44 (referencing relevant record evidence).

**58.** *See* SolarWorld's Br., ECF Nos. 104 & 105, at 5–9 (arguing that Commerce's findings that the state-owned shareholder owned 20 percent of Ningbo ETDZ's shares and recommended Ningbo ETDZ's Chairman of the Board and [[ ]] should have been given dispositive weight, necessarily leading the agency to conclude that Ningbo ETDZ's operations were controlled by the Chinese government). Although SolarWorld argues that Commerce did not address SolarWorld's argument that the Chairman of the Board "[[ ]]," *id.* at 7, Commerce conceded that the circumstances surrounding the selection of Ningbo ETDZ's Chairman of the Board weighed on the side of state-control, *see Remand Results*, ECF Nos. & 98–1, at 12, but ultimately concluded that this evidence was outweighed by other evidence on the record, *id.* at 12–13. Thus SolarWorld does not point to any evidence that

"fairly detracts from [the] weight" of the evidence supporting Commerce's conclusion, *cf. Univ. Camera*, 340 U.S. at 488, 71 S.Ct. 456, but rather invites the court to reweigh conflicting evidence, which is not this Court's function. *See, e.g., Am. Bearing Mfrs. Ass'n v. United States*, 28 CIT 1698, 1700, 350 F.Supp.2d 1100, 1104 (2004) ("[T]he court's function is not to reweigh the evidence but rather to ascertain 'whether there was evidence which could reasonably lead to the [agency]'s conclusion....'") (quoting *Matsushita Elec. Indus. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984)).

**59.** *See supra* notes 37, 42, and 44 (referencing relevant factual findings and record evidence). SolarWorld attempts to make its own (contrary) inferences. *See, e.g.*, SolarWorld's Br., ECF Nos. 104 & 105, at 9 n.4 (arguing that the [[ ]], who was recommended by Ningbo ETDZ's non-governmental general manager, "would *presumably* be under the direct control of the company's [[ ]]," who was nominated by the state-owned shareholder) (emphasis added). But Commerce may make reasonable inferences from the record evidence, *SolarWorld I*, 28 F.Supp.3d at 1339 (citing *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed.Cir.1993) (explaining that substantial evidence may include "reasonable inferences from the record")), and in the absence of actual evidence to the contrary, SolarWorld's speculation regarding possible contrary interpretations of the existing record evidence does not impugn the reasonableness of Commerce's conclusion.

ernment control over export activities" (and is therefore eligible for a separate rate)[60] is supported by substantial evidence, and is therefore sustained.

## CONCLUSION

For all of the foregoing reasons, Commerce's *Remand Results* are affirmed. Judgment will issue accordingly.

60. *Remand Results,* ECF Nos. & 98–1, at 13.