Mark A. Barnett, Judge
Barnett, Judge: Plaintiffs Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. ("Lianzhou"), and Zhejiang Quhua Fluor-Chemistry Co., Ltd. ("Quhua") (together, "Plaintiffs"), challenge the United States Department of Commerce's ("Commerce" or the "agency") final determination in the antidumping duty investigation of 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China ("PRC" or "China"). See 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China , 82 Fed. Reg. 12,192 (Dep't Commerce March 1, 2017) (final determination of sales at less than fair value and aff. determination of critical circumstances, in part) (" Final Determination "), ECF No. 19-4, and accompanying Issues and Decision Memorandum ("I & D Mem."), A-570-044 (Feb. 21, 2017), ECF No. 19-5.[1] Specifically, Plaintiffs challenge Commerce's denials of Lianzhou's and Quhua's requests for separate rates and assignment thereto of the China-wide antidumping duty rate. See Confidential Pls.' Mot. for J. on the Agency R. and Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. ("Pls.' Mem."), ECF No. 26. Defendant United States ("Defendant") and Defendant-Intervenors[2] support Commerce's determination. See Def.'s Resp. to Pls.' Mots. [sic] for J. on the Agency R. ("Def.'s Resp."), ECF No. 32; Confidential Resp. Br. of Arkema Inc., The Chemours Co. FC, LLC, Honeywell International Inc., and Mexichem Fluor, Inc. ("Def.-Ints.' Resp."), ECF No. 33. For the following reasons, Plaintiffs' motion is denied.
BACKGROUND
On March 23, 2016, Commerce initiated an investigation into 1,1,1,2 Tetrafluoroethane (R-134a) from China alleged to have been sold in the United States at less than fair value. See 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China , 81 Fed. Reg. 18,830, 18,830 (Dep't Commerce April 1, 2016) (initiation of less than fair value investigation), PR 27, CJA Tab 3, PJA Tab 3, ECF No. 40.[3] In the notice of initiation, Commerce directed exporters and producers seeking a separate rate to submit a separate rate application and respond to Commerce's quantity and value questionnaire. Id. at 18,834. Commerce further instructed that companies selected as mandatory respondents must respond to all parts of the agency's antidumping questionnaire to be eligible for a separate rate. Id.
Quhua timely submitted its separate rate application. See Quhua Separate Rate Appl. (May 9, 2016) ("Quhua SRA"), CR 50-54, PR 70-71, CJA Tab 4, PJA Tab 4, ECF No. 40. Commerce selected Lianzhou as a mandatory respondent; thus, Lianzhou submitted its request for a separate rate in Section A of its questionnaire response. See Respondent Selection Mem. (Apr. 26, 2016) at 1, CR 34, PR 60, CJA Tab 10, PJA Tab 10, ECF No. 40; Lianzhou Sec. A Questionnaire Resp. (May 31, *1312 2016) ("Lianzhou AQR") at 2-22, CR 66-83, PR 87-92, CJA Tab 5A, PJA Tab 5, ECF No. 40.
In September 2016, Commerce preliminarily denied Lianzhou's and Quhua's separate rate requests. See Decision Mem. for Prelim. Determination (Sept. 29, 2016) ("Prelim. Mem.") at 17, PR 172, CJA Tab 6, PJA Tab 6, ECF No. 41; Prelim. Denial of Separate Rates (Sept. 29, 2016) ("Separate Rate Mem."), CR 151, PR 176, CJA Tab 7, PJA Tab 7, ECF No. 41.[4] Commerce determined that Plaintiffs' respective chains of ownership each extended to the Chinese government because Lianzhou and Quhua are wholly-owned by Zhejiang Juhua Co., Ltd. ("Zhejiang Juhua"),[5] which, in turn, is majority owned (55.86 percent) by Juhua Group Corporation ("Juhua Group"), a state-owned enterprise ("SOE") supervised by the State-owned Assets Supervision and Administration Commission ("SASAC") of Zhejiang province. Id. at 2 & n.9 (citing Quhua SRA at 16, Exs. 7D, 12).[6] Commerce also noted that Juhua Group may "elect Zhejiang Juhua's directors ... in accordance with the number of shares it owns, i.e., 55.86 percent." Id. at 2.[7] Zhejiang Juhua, in turn, appoints Lianzhou's and Quhua's executive director, supervisor, and general manager. Id. at 2 & nn.7, 10 (citing, inter alia , Lianzhou AQR at 22;[8] Quhua SRA at 16, Exs. 7D, 12). With respect to Lianzhou, Commerce explained that "the general manager appoints other managers, including deputy general managers." Separate Rate Mem. at 2. With respect to Quhua, Commerce explained that Article 9 of Quhua's articles of association "establishes that all operations, profit distribution, etc. are subject to review by Zhejiang Juhua, whose management is subject to government control." Separate Rate Mem. at 2 & n.11 (citing Quhua SRA at 16, Exs. 7D, 12).[9]
On March 1, 2017, Commerce affirmed its preliminary finding in the Final Determination . 82 Fed. Reg. at 12,194 n.16. Commerce confirmed that Plaintiffs are each "indirectly majority-owned by an SOE," i.e, Juhua Group, and explained that it "would expect any majority shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including *1313 the selection of management and the [company's] profitability." I & D Mem. at 12 & n.65 (citing Lianzhou AQR at 11; Quhua SRA at 12). According to Commerce, "the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally." Id. at 11. Commerce pointed to the "various responsibilities" assigned to Juhua Group in Zhejiang Juhua's articles of association, id. at 13 & n. 68 (citing Quhua SRA, Ex. 7C ("Zhejiang Juhua Arts. of Assoc.") ), and Zhejiang Juhua's active participation in Plaintiffs' daily operations, id. at 12-13 & n.67 (citing Lianzhou AQR at 25).
Commerce disagreed with Plaintiffs' argument that Chinese law insulates them from government control, finding instead that the various legal provisions relied upon by Plaintiffs enable the government to "control the business activities of a company when the government is a controlling shareholder." Id. at 13 & n.73 (citation omitted).
Commerce further disagreed with Plaintiffs' argument that their respective articles of association place control over their day-to-day operations with their respective managers. Id. at 14-15. Upon review of those documents, Commerce determined that "Quhua's and Lianzhou's management is beholden to Zhejiang Juhua, the sole owner of each company, whose board is controlled by Juhua Group, which is wholly state-owned." Id. at 14 & n.81 (citing Lianzhou AQR, Ex. A-7; Quhua SRA, Ex. 10). According to Commerce, "[t]he fact that Quhua's and Lianzhou's shareholder appoints and changes the executive directors, general managers, and supervisors does not prove the absence of government control when the only shareholder, who is majority owned by SASAC, controls all shareholder decisions." Id. at 15.
Commerce also rejected Plaintiffs' argument that the agency had impermissibly relied on the mere potential for government control by failing to cite to a specific instance of Juhua Group exercising its legal right to control or influence Plaintiffs' exports of subject merchandise. Id. Commerce noted that Plaintiffs bear the burden of rebutting the presumption of government control, and evidence demonstrated that "Juhua Group, has the right to '[perform] supervision on, making suggestion for or inquiry on the operation of Zhejiang Juhua, the sole shareholder of Quhua and Lianzhou.' " Id. at 15 & n.89 (citing Zhejiang Juhua Arts. of Assoc., Art. 32(III) ).
On May 18, 2017 Plaintiffs initiated this action challenging Commerce's Final Determination . Summons, ECF No. 1; Compl., ECF No. 8. Plaintiffs' joint Rule 56.2 motion is fully briefed, and on September 11, 2018, the court heard oral argument. ECF No. 47.
JURISDICTION AND STANDARD OF REVIEW
The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i)(2012),[10] and 28 U.S.C. § 1581(c) (2012). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Huaiyin Foreign Trade Corp. (30) v. United States , 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *1314 Consol. Edison Co. v. NLRB. , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ).
DISCUSSION
I. Legal Framework Governing Separate Rate Status in Proceedings Involving Nonmarket Economy Countries
In antidumping duty proceedings involving a country, such as China, that Commerce considers to have a nonmarket economy, Commerce employs a rebuttable presumption that all enterprises operating within that country are controlled by the government. See Huaiyin Foreign Trade Corp., 322 F.3d at 1372 ; Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (reviewing and affirming Commerce's use of the presumption); Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States ("Jiasheng I "), 38 CIT ----, ----, 28 F.Supp.3d 1317, 1338 (2014). Commerce assigns each exporter of subject merchandise a single countrywide rate, unless the exporter requests an "individualized antidumping duty margin" and "demonstrate[s] an absence of state control" over its export-related activities, Huaiyin Foreign Trade Corp., 322 F.3d at 1372, both in law (de jure ) and in fact (de facto ), Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States ("Jiasheng II "), 39 CIT ----, ----, 121 F.Supp.3d 1263, 1266 (2015) ; see also Sigma Corp. , 117 F.3d at 1405 ("no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both de jure and de facto independence from the central government"). The exporter of subject merchandise bears the burden of showing it is autonomous of government control. AMS Assoc., Inc. v. United States , 719 F.3d 1376, 1379-80 (Fed. Cir. 2013) ; see also Sigma Corp. , 117 F.3d at 1405-06 (Commerce's decision to place the burden on exporters is justified because exporters have best access to information) (citing Zenith Elecs. Corp. v. United States , 988 F.2d 1573, 1583 (Fed. Cir. 1993) ).
To establish whether an exporter is eligible for a separate rate, Commerce applies a test it first set forth in Sparklers from the People's Republic of China , 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determination of sales at less than fair value), and modified in Silicon Carbide from the People's Republic of China , 59 Fed. Reg. 22,585, 22,586 -87 (Dep't Commerce May 2, 1994) (final determination of sales at less than fair value); see also Policy Bulletin on the Topic of Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) ("Policy Bulletin 05.1") at 1-2, available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Oct. 4, 2018) (restating the de jure and de facto criteria). Only Commerce's finding pursuant to the de facto test is challenged here.[11]
To determine whether an exporter is free of de facto government control, Commerce considers four factors: (i) whether export prices are set by or subject to the approval of a governmental authority; (ii) whether the exporter has authority to negotiate and sign contracts and other agreements; (iii) whether the exporter has autonomy from the government in making decisions regarding the selection of its management; and (iv) whether the exporter retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses. Policy Bulletin 05.1 at 2; see also Jiasheng I , 28 F.Supp.3d at 1349.
Here, Commerce's denial of a separate rate turned on Plaintiffs' failure to establish that it met the third criterion regarding *1315 management selection. I & D Mem. at 12-15. Plaintiffs challenge Commerce's determination as lacking substantial evidence and unlawful. See generally Pls.' Mem.
II. Whether Commerce's Determination is Supported by Substantial Evidence
A. Parties' Contentions
Plaintiffs contend that Commerce erroneously treated them as part of the PRC-wide entity on the basis of mere potential for government control over management selection through indirect majority ownership. Pls.' Mem. at 31-35; Confidential Pls.' Reply Br. ("Pls.' Reply") at 2-5, ECF No. 38. Plaintiffs further contend that extensive record evidence demonstrates their autonomy from the government with regard to management selection. Pls.' Mem. at 28-31. Specifically, Plaintiffs contend that Zhejiang Juhua's articles of association and Chinese law together protect Zhejiang Juhua from its controlling shareholder and ensure that "[t]he democratically elected Zhejiang Juhua board selects its own management, as well as that for Plaintiffs." Id. at 31 (asserting that "the public ownership of Zhejiang Juhua extinguishes any ability for Juhua Group or SASAC to control the selection of Plaintiffs' management."). Plaintiffs also contend that Commerce impermissibly denied their separate rate requests on the basis of a single de facto criterion, id. at 24-28, and misapplied relevant judicial precedent, id. at 35-41; see also Pls.' Reply at 14-17 (seeking to distinguish cases affirming separate rate denials when a state-owned enterprise held indirect majority ownership).[12]
Defendant and Defendant-Intervenors contend that Commerce's reliance on indirect majority ownership to find that Plaintiffs failed to rebut the presumption of government control is supported by substantial evidence. Def.'s Resp. at 16-17, 19-25; Def.-Ints.' Resp. at 7-11. Defendant further asserts that Commerce properly relied on Plaintiffs' failure to demonstrate autonomy with regard to management selection to deny their separate rate requests, Def.'s Resp. at 18-19, and Commerce's determination is consistent with relevant judicial precedent, id. at 26-31; see also Def.-Ints.' Resp. at 11-14.
B. Commerce's Determination that Plaintiffs Failed to Rebut the Presumption of Government Control is Supported by Substantial Evidence
Plaintiffs first challenge Commerce's determination as "based entirely on speculation" and "the mere potential for control" by their indirect majority government owner. Pls.' Mem. at 32, 35. Plaintiffs' argument fails to recognize Commerce's reevaluation of the manner in which it interprets evidence of government ownership in connection with the presumption of government control as a result of a series of court opinions issued in response to the Diamond Sawblades proceeding. See Diamond Sawblades and Parts Thereof from the People's Republic of China , 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) (final determination of sales at less than fair value and final partial aff. determination of critical circumstances), as amended, *1316 71 Fed. Reg. 35,864 (Dep't Commerce June 22, 2006) ; Advanced Tech. & Materials Co., Ltd. v. United States ("AT & M I "), Slip. Op. 11-122, 2011 WL 5191016, at *1 (CIT Oct. 12, 2011) ; Advanced Tech. & Materials Co., Ltd. v. United States ("AT & M II "), 36 CIT ----, 885 F.Supp.2d 1343 (2012) ; Advanced Tech. & Materials Co., Ltd. v. United States ("AT & M III "), 37 CIT ----, 938 F.Supp.2d 1342 (2013), aff'd , 581 F. App'x. 900, 901 (Fed. Cir. 2014) ;[13] I & D Mem. at 11 (noting Commerce's ongoing evaluation of its practice).
In litigation arising out of the Diamond Sawblades proceeding, the domestic industry challenged Commerce's grant of a separate rate to Advanced Technology & Materials Co. Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. (collectively, "AT & M"). See AT & M I , 2011 WL 5191016, at *1. Commerce had initially granted AT & M a separate rate even though AT & M was majority-owned by the Central Iron and Steel Institute ("CISRI"), which, in turn, was wholly-owned and controlled by SASAC. Id. at *5. At the time, Commerce did not consider the "activities of [an exporter's] owner, or its owner's parent company," when conducting its separate rate analysis and, thus, had not addressed evidence showing that certain of CISRI's board-members sat on AT & M's board and that AT & M's president and vice chairman sat on CISRI's board. Id. at *10, *12. The court remanded Commerce's determination for further consideration of the implications of this indirect government majority ownership. See id. at *10, *12, *14.
On remand, Commerce initially affirmed its separate rate determination. See AT & M II , 885 F.Supp.2d at 1348-49. Commerce did not find the overlapping board membership between AT & M and CISRI compelling on the basis that candidates nominated by CISRI to sit on AT & M's board required unanimous consent to gain appointment and, thus, CISRI did not " 'control' AT & M's board," and further noted that "CISRI's representatives on the board are a minority in number." Id. at 1348-49.
The court again remanded Commerce's determination for failure "to consider important aspects of the problem." Id. at 1349. The court noted that four of AT & M's nine directors were CISRI representatives and the absence of evidence that the five "non-CISRI" directors were free from government control. Id. at 1358-59. The court further noted that two of the "non-CISRI" directors occupied AT & M management positions and, thus, were "beholden to the board that controls their pay." Id. Because "board members are properly presumed subject to governmental control, directly or indirectly," the court concluded that "true independence and autonomy remain[ed] in doubt until proven otherwise." Id. The court characterized Commerce's reliance on the absence of record evidence demonstrating SASAC's exercise of its legal right to intervene "in the selection of management and board members ... as an evisceration of the presumption of state control." Id. at 1358. The court opined that the presumption had not been rebutted to the point of shifting the burden to the domestic industry to prove actual instances of government intervention. Id.
In the second remand redetermination, Commerce, under protest,[14] denied *1317 AT & M's separate rate request on the basis that it had not demonstrated autonomy from the government with regard to management selection. AT & M III , 938 F.Supp.2d at 1344. Commerce explained that "government control had the potential to pass from SASAC through to [AT & M] via CISRI," and this potential was exercised by CISRI's nomination of five AT & M board members and its placement of four of its officials on AT & M's board. Id. at 1345. The court sustained Commerce's determination. Id. at 1353.
Commerce's "protest" notwithstanding, in subsequent proceedings Commerce has viewed evidence of majority government ownership as "mean[ing] that the government exercises or has the potential to exercise control over the company's operations generally, which may include control over, for example, the selection of management ...." Decision Mem. for the Prelim. Determination of the Antidumping Duty Investigation of Carbon and Certain Alloy Steel Wire Rod from the PRC, A-570-012 (Aug. 29, 2014) ("Steel Wire Rod Mem.") at 6-7, available at https://enforcement. trade.gov/frn/summary/prc/2014-21335-1.pdf (last visited Oct. 4, 2018). Accordingly, Commerce now "consider[s] the level of government ownership where necessary." Id. at 7; see also id. at 8-9 (denying separate rates to certain exporters on the basis of evidence of indirect majority government ownership); Issues and Decision Mem. for the Final Aff. Determination in the Less-Than-Fair-Value Investigation of Hydrofluorocarbon Blends and Components Thereof from the PRC, A-570-028 (June 21, 2016) at 50-53, available at https://enforcement.trade.gov/frn/summary/prc/2016-15298-1.pdf (last visited Oct. 4, 2018) (same); 1,1,1,2-Tetrafluoroethane from the PRC: Issues and Decision Mem. for the Final Determination of Sales at Less Than Fair Value Antidumping Duty Investigation, A-570-998 (Oct. 14, 2014) at 8-10, available at https://enforcement.trade.gov/frn/summary/prc/2014-24903-1.pdf (last visited Oct. 4, 2018) (same).
The court recently addressed Commerce's use of the word "potential" as it now relates to government control in cases involving majority and minority government ownership. See An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States ("An Giang II "), 42 CIT ----, ----, 284 F.Supp.3d 1350, 1361-64 (2018).[15] In An Giang II , the court explained that, in the context of majority government ownership, "potential control ... is, for all intents and purposes, actual control" because "the majority shareholder can typically control the operations of a company without actually removing directors or management since it is clear that directors or management could be removed." Id. at 1359 (citing AT & M III , 938 F.Supp.2d at 1348 ; Jiasheng II , 121 F.Supp.3d at 1266 ) (emphasis added). In contrast, when, as in An Giang II , there is minority government ownership, the phrase "potential control" may not suggest "actual control." Id. Under those circumstances, "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of de facto government control." Id. ; see also id. at 1361-1364 (affirming Commerce's denial of a separate rate in light of evidence that an exporter's general director was "beholden" to the minority government shareholder responsible for appointing him, as well as evidence that company employees were "beholden" to *1318 the general director that controlled their pay and had the ability to fire them).
The foregoing discussion demonstrates that Commerce views government ownership differently depending on whether the government is a majority or minority owner. Evidence of legal separation between an exporter subject to the nonmarket economy presumption of government control and its parent company (and its parent's state-owned parent company) of the type relied upon by Plaintiffs here may rebut the presumption of de facto control over management selection when the government holds a minority stake. Cf. Jiasheng II , 121 F.Supp.3d at 1268-73 (affirming Commerce's grant of a separate rate on the basis that evidence of minority ownership alone was insufficient to demonstrate de facto control); An Giang II , 284 F.Supp.3d at 1361-64 (affirming Commerce's denial of a separate rate in light of evidence of minority ownership plus instances of actual control). In contrast, when, as here, the government owns a majority stake, legal separation between the exporter and its direct and indirect parent companies does not rebut the presumption because of the ever-present potential for the government to exert de facto control over the exporter's operations and management selection, and the expectation that it would do so. See I & D Mem. at 11-12. In the latter instance, absent contrary evidence,[16] Commerce reasonably infers that the government exerts de facto control by exercising its legal rights as a majority shareholder of the exporter's parent company, rendering each link in the chain of ownership ultimately beholden to the government. See id. at 14; Jiasheng I , 28 F.Supp.3d at 1339 ("In both its de jure and de facto determinations, Commerce may make reasonable inferences from the record evidence.") (citing Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ); cf. AT & M II , 885 F.Supp.2d at 1353 (explaining that Chinese corporate law protects the rights of investors; thus, when the government is the controlling investor/shareholder, the law "subject[s] the investee to governmental control") (emphasis omitted).[17]
Plaintiffs do not contest Commerce's factual findings regarding Lianzhou's and Quhua's respective chains of ownership. Pls.' Mem. at 31-32 (citing I & D Mem. at 12). Plaintiffs assert that record evidence nevertheless demonstrates autonomy with regard to management selection. Pls.' Mem. at 28-31. Plaintiffs' assertion is unavailing.
Plaintiffs first point to the lack of direct involvement of SASAC/Juhua Group in the selection or activities of Plaintiffs' respective boards, and the lack of SASAC's direct involvement in the selection or activities of Zhejiang Juhua's board. Pls.' Mem. at 28 (citations omitted). Plaintiffs' argument ignores that Juhua Group, an SOE, is the majority owner of Zhejiang Juhua, and that Zhejiang Juhua, subject to that majority ownership, is the sole owner of the Plaintiffs. See, e.g. , I & D Mem. at 12 (discussing evidence of indirect majority ownership).
*1319 Plaintiffs also point to various aspects of Zhejiang Juhua's articles of association. Pls.' Mem. at 28-30. Plaintiffs argue that Article 39 "ensur[es] that [ ] Juhua Group is a passive investor." Pls.' Mem. at 28; see also id. at 29 ("Zhejiang Juhua is required by its [articles of association] to conduct its business operations as if it were 100 percent owned by the public, without any ownership interest of Juhua Group.)." However, Article 39-which provides, inter alia , that "[a] controlling shareholder ... shall not take advantage of its relationship to harm the interests of The Company," and owes "a fiduciary duty to The Company"-does not render Juhua Group a passive investor. See Zhejiang Juhua Arts. of Assoc., Art. 39. Article 39 simply requires that any actions Juhua Group takes as majority owner of Zhejiang Juhua are not harmful to Zhejiang Juhua's financial interest. See id.
Plaintiffs next assert that Articles 40, 42, and 199 of Zhejiang Juhua's articles of association, along with Articles 37, 39, 99, and 100 of the Company Law of the People's Republic of China ensure the democratic and transparent election of Zhejiang Juhua's board. Pls.' Mem at 29; see also Lianzhou AQR, Ex. A-15 (Company Law of the People's Republic of China (effective March 1, 2014) ("PRC Company Law"). Article 39 of the PRC Company Law provides for the classification of shareholder meetings into regular and interim meetings. PRC Company Law, Art. 39. Article 99 cross-references and makes applicable Article 37, which provides for a company's shareholders to elect and replace its directors and supervisors, and to decide their pay. Id. , Arts. 37, 99. Article 100 states that "[t]he general meeting of a company shall hold an annual meeting once every year." Id. , Art. 100. Articles 40 and 42 of Zhejiang Juhua's articles of association mirror those provisions. See Zhejiang Juhua Arts. of Assoc., Art. 40 (discussing the shareholders' general meeting and associated functions, including appointment and remuneration powers), Art. 42 (discussing the classification of shareholder meetings).[18] None of these provisions, however, constrain Juhua Group's ability to elect Zhejiang Juhua's directors in accordance with its majority shareholding. See Separate Rate Mem. at 2; Zhejiang Juhua Arts. of Assoc., Art. 32(II) (providing for voting in accordance with shareholdings).
Plaintiffs further assert that Articles 20 and 21 of the Code of Corporate Governance for Listed Companies and Articles 56 and 86[19] of Zhejiang Juhua's articles of association protect Zhejiang Juhua from its controlling shareholder. Pls.' Mem. at 29-30; see also Lianzhou AQR, Ex. A-16 (Circular of the China Securities Regulatory Commission and the State Economic and Trade Commission on the Issuance of the Code of Corporate Governance for Listed Companies, Jan. 7, 2002) ("Corp. Code Circular"). Pursuant to Article 20, "controlling shareholders shall nominate the candidates for directors and supervisors in strict compliance with ... laws, regulations and the company's articles of association." Corp. Code Circular, Art. 20. Article 21 prohibits "controlling shareholders [from] ... directly or indirectly interfer[ing] with the company's [lawful] decisions or business activities." Id. , Art. 21. Articles 56 and 86 of Zhejiang Juhua's articles of association require "candidates for directors and supervisors" to disclose *1320 affiliations with controlling shareholders, and prevent shareholders from voting on matters in which they retain an interest. Zhejiang Juhua Arts. of Assoc., Arts. 56, 86. These rules and requirements, however, exist alongside, and do not undermine, Juhua Group's "right to [perform] supervision on, making suggestion for or inquiry on the operation of Zhejiang Juhua, the sole shareholder of Quhua and Lianzhou." I & D Mem. at 15 & n.89 (citing, inter alia , Zhejiang Juhua Arts. of Assoc., Art. 32(III) ) (internal quotation marks and additional citations omitted).[20]
Plaintiffs additionally point to Zhejiang Juhua's "cumulative voting"[21] system and online voting procedures that permit "smaller shareholders to have greater representation in voting." Pls.' Mem. at 30 (citing Zhejiang Juhua Arts. of Assoc., Art. 82). Even if that were true, Plaintiffs have not shown that these provisions constrain Juhua Group's exercise of its rights as majority shareholder.
Plaintiffs' reliance on Articles 125, 127, and 137 of Zhejiang Juhua's articles of association also lacks merit. See id. at 30. Article 127 provides that each board member holds one vote, while Article 125 provides that resolutions require more than half of all votes to pass. See Zhejiang Juhua Arts. of Assoc., Arts. 125, 127. Juhua Group's ability to elect the majority of the board, however, means that it effectively controls the majority of the votes. See id. , Art. 32(II). Article 137 bars "[t]he person, who assumes the posts other than the director in a controlling shareholder or an actual controller," from "assum[ing] the post of senior management in [Zhejiang Juhua]." Id. , Art. 137. This provision, however, appears to leave open the possibility that Juhua Group's "directors" or "controllers" may in fact assume positions within Zhejiang Juhua's senior management, which positions include "general manager, deputy general manager, person in charge of finance, and secretary of the Board of Directors." See id. , Art. 135.
In sum, Plaintiffs' insistence that Zhejiang Juhua's articles of association, the PRC Company Law, and the Corp. Code Circular "extinguish[ ]" the government's de facto control of Lianzhou and Quhua fails to persuade. See Pls.' Mem. at 32. Instead, the cited provisions represent the legal vehicles through which Juhua Group exercises its control over Zhejiang Juhua and, thus, Quhua and Lianzhou. There is, therefore, substantial evidence supporting Commerce's determination that Quhua's and Lianzhou's management is "beholden" to Zhejiang Juhua, whose board is controlled by the government-owned Juhua Group. See I & D Mem. at 14; Separate Rate Mem. at 2.
*1321 Having determined that Plaintiffs failed to demonstrate autonomy vis-à-vis management selection, Commerce was not required to conduct further analysis.[22] "The absence of de facto government control can be shown by evidence that the exporter sets its prices independently of the government and of other exporters, negotiates its own contracts, keeps the proceeds of its sales (taxation aside), and selects its management autonomously." AMS Assoc. , 719 F.3d at 1379 (citation omitted) (emphasis added). The test is conjunctive; thus, "Commerce requires that exporters satisfy all four factors of the de facto control test in order to qualify for separate rate status." Yantai CMC Bearing Co. Ltd. v. United States , 203 F.Supp.3d 1317, 1326 (2017) (citing AT & M III , 938 F.Supp.2d at 1349 ). Because Plaintiffs failed to satisfy one de facto criterion, "Commerce had no further obligation to continue with the analysis." Id. at 1326 ; see also Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States ("Rongxin III "),[23] 42 CIT ----, 331 F.Supp.3d 1390, 1403-04, Slip Op. 18-107 (Aug. 29, 2018).[24]
Finally, Plaintiffs' argument that Commerce's determination is inconsistent with relevant judicial precedent lacks merit. Plaintiffs seek to distinguish the Diamond Sawblades proceeding and Yantai CMC on the basis that those cases involved instances of actual control and on the basis that those cases did not address the protections afforded to publicly-traded companies by the Corp. Code Circular. Pls.' Mem. at 36-37 (citing AT & M II , 885 F.Supp.2d at 1352, 1356 ); Pls.' Mem. at 39 (citing Yantai CMC , 203 F.Supp.3d at 1326 ). Plaintiffs appear to misunderstand their burden. Commerce presumes that exporters from a nonmarket economy country, such as China, are government-controlled unless the exporter demonstrates otherwise. See, e.g. , Huaiyin Foreign Trade Corp., 322 F.3d at 1372. Plaintiffs' evidence, which documented the unbroken chain of ownership from the Chinese government to Lianzhou and Quhua and set forth the corporate and legal mechanisms pursuant to which Juhua Group and Zhejiang Juhua discharge their ownership duties, failed to rebut the presumption. Cf. AT & M II , 885 F. Supp. 3d at 1358.[25] The lack of evidence of specific instances of actual control does not render Commerce's *1322 finding unsupported by substantial evidence; indeed, in the context of majority government ownership, requiring Commerce to point to such evidence turns the presumption on its head by placing the burden on petitioners to prove the absence of autonomy. See AMS Assoc., Inc. , 719 F.3d at 1379-80 (the respondent/exporter bears the burden of demonstrating autonomy from government control); cf. An Giang II , 284 F.Supp.3d at 1359 (noting that, in the context of minority ownership, Commerce requires additional evidence of control before concluding that an exporter has failed to rebut the presumption). Plaintiffs' attempts to analogize the facts of this case to those in which the court has remanded Commerce's separate rate determinations are also unavailing.[26]
In sum, Commerce's finding that Plaintiffs failed to rebut the presumption of government control is supported by substantial evidence.
III. Whether Commerce's Determination is in Accordance with Law
A. Parties' Contentions
Plaintiffs contend that Commerce misapplied the presumption of government control. Pls.' Mem. at 41-42. According to Plaintiffs, the evidence they submitted rebutted the presumption; thus, Commerce impermissibly denied their separate rate applications absent evidence of specific instances of actual control. Id. at 41-42; see also Pls' Reply at 10-14. Plaintiffs also assert that Commerce has "convert[ed] the presumption into an irrebuttable finding of government control based on indirect ownership" without "indicat[ing] what type of evidence would have been sufficient for separate rates." Pls.' Mem. at 42. Plaintiffs further contend that Commerce departed from the separate rate methodology stated in Policy Bulletin 05.1 without adequately acknowledging or explaining its departure therefrom. Id.
Defendant contends that Commerce applied properly the presumption of government control and correctly found that Plaintiffs' evidence failed to address Juhua Group's indirect control over Lianzhou and Quhua. Def.'s Resp. at 31. Defendant further contends that Commerce adhered to its long-standing separate rate methodology, and Plaintiffs' arguments "amount to mere disagreement" with the agency's conclusion. Def.'s Resp. at 31-32.[27]
*1323 B. Commerce Applied Properly the Presumption of Government Control
Plaintiffs assert that Commerce's analysis ran afoul of Federal Circuit precedent regarding the operation of presumptions. See Pls.' Mem. at 41-42 (citing A.C. Aukerman Co. v. R.L. Chaides Const. Co. , 960 F.2d 1020 (Fed. Cir. 1992), abrogated on unrelated grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC , --- U.S. ----, 137 S.Ct. 954, 959, 197 L.Ed.2d 292 (2017) ). Quoting Aukerman 's discussion of Federal Rule of Evidence 301, which governs what is referred to as the "bursting bubble" theory of presumptions,[28] Plaintiffs assert they met their burden of producing the "minimum quantum of evidence" necessary to rebut the presumption. Pls.' Mem. at 41-42 (quoting Aukerman , 960 F.2d at 1037 ). The foregoing discussion demonstrates, however, that Commerce properly found that Plaintiffs' evidence wholly failed to rebut the presumption of government control. See supra pp. 1318-22; I & D Mem. at 12-15. Thus, to the extent Aukerman informs the court's analysis, it is unhelpful to Plaintiffs' position.
Additionally, the court disagrees with Plaintiffs' assertion that Commerce has "convert[ed] the presumption into an irrebuttable finding of government control based on indirect ownership." Pls.' Mem. at 42. The presence of direct or indirect majority government ownership may require exporters to surmount a high bar to demonstrate the absence of de facto control, but it does not necessarily preclude exporters from obtaining a separate rate. See Def.'s Resp. at 22-23 (noting, for example, the absence of evidence "that [ ] Juhua Group did not actually vote its shares");[29] cf. Yantai CMC , 203 F.Supp.3d at 1325-26 ("That particular facts (majority ownership) may be sufficient to support an agency determination of control, and the existence of those facts in this particular case (i.e. , indirect majority control by SASAC), does not alter the test into an irrebuttable presumption; instead, it means that, on the basis of these facts, Plaintiff failed to rebut the presumption."). That Commerce did not forecast the type of evidence that would be sufficient to rebut the presumption does not render its determination unreasonable or unsupported by substantial evidence.
*1324 C. Commerce Adhered to its Longstanding Separate Rate Analysis
Plaintiffs assert that Commerce deviated from Policy Bulletin 05.1 by (1) denying a separate rate on the basis of a single de facto criterion and thereby treating government ownership as dispositive; (2) relying on the potential for government control instead of actual control; and (3) acting contrary to a prior proceeding in which Commerce granted a separate rate notwithstanding evidence of government involvement in management selection. Pls.' Mem. at 42-43 (citations omitted); see also Pls.' Reply at 17-21. The court has largely dispensed with these arguments elsewhere. See supra pp. 1321 & n.22 (Commerce properly may rely on a single criterion); id. pp. 1317-18 (clarifying Commerce's consideration of potential control in the context of majority versus minority ownership and the implications thereto with regard to rebutting the presumption); id. pp. 1321-22 & n.26 (squaring this case with judicial precedent).
Briefly, Policy Bulletin 05.1 does not direct or otherwise require Commerce to address each de facto criterion and the de jure prong of its separate rate test before denying an exporter a separate rate. Policy Bulletin 05.1 at 1-2 (summarizing Commerce's separate rate test); see also Yantai CMC , 203 F.Supp.3d at 1326 ; Rongxin III , 331 F.Supp.3d at 1403-04, Slip Op. 18-107. Plaintiffs' assertion that Commerce "treated government ownership as dispositive," Pls.' Mem. at 43, overlooks Commerce's consideration of the degree of government ownership (majority or minority), and fails to disprove the evidentiary bases supporting Commerce's determination. Plaintiffs' reliance on Jiasheng II[30] to support the assertion that Commerce's decision contradicts prior determinations is unavailing. See id. (citing Jiasheng II , 121 F.Supp.3d at 1269 ). Jiasheng II concerned minority government ownership, see 121 F.Supp.3d at 1269 ; thus, government ownership was not dispositive of the degree of government control.
In sum, though Commerce now accords more weight to evidence of an exporter's government ownership as a consequence of the Diamond Sawblades proceeding, it does so within the confines of its longstanding separate rate test. See I & D Mem. at 10-12. Commerce has, moreover, placed exporters on notice of this change. See, e.g. , Steel Wire Rod Mem. at 6-7. Plaintiffs may disagree with the conclusions Commerce reaches on the basis of this evidence, but mere disagreement is not a sufficient basis to remand Commerce's determination. Accordingly, Commerce's decision to deny Plaintiffs' requests for separate rates is in accordance with law.
CONCLUSION
For the foregoing reasons, Plaintiffs' motion is denied. Judgment will enter accordingly.

The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 19-1, and a Confidential Administrative Record ("CR"), ECF No. 19-2. Parties submitted joint appendices containing record documents cited in their briefs. See Public JA ("PJA"), ECF No. 42; Confidential JA ("CJA"), ECF Nos. 40-41. The court references the confidential versions of the relevant record documents, if applicable, throughout this opinion, unless otherwise specified.

Defendant-Intervenors include Arkema Inc., The Chemours Co. FC, LLC, Honeywell International Inc., and Mexichem Fluor, Inc. (collectively, "Defendant-Intervenors").

The period of investigation is July 1, 2015 to December 31, 2015. Final Determination , 82 Fed. Reg. at 12,192.

Thereafter, Lianzhou did not participate as a mandatory respondent. See Prelim. Mem. at 3 (explaining that Commerce did not issue supplemental questionnaires to Lianzhou on the basis of its preliminary finding of ineligibility for a separate rate).

Zhejiang Juhua is a "publicly-traded company listed on the Shanghai Stock Exchange." Lianzhou AQR at 11 (emphasis omitted); see also Quhua SRA at 12.

Exhibit 7D consists of various public announcements regarding actions taken at Zhejiang Juhua's annual shareholder meetings. See Quhua SRA, Ex. 7D. Exhibit 12 consists of letters documenting Zhejiang Juhua's appointment of Quhua's executive director, supervisor, general manager, and person in charge of finance. See Quhua SRA, Ex. 12.

Certain information treated as business proprietary in the Separate Rate Memorandum and other record documents is disclosed herein on the basis of Plaintiffs' representation to the court that the information is now public.

Commerce also cited to "Ex. A-9 at Art. 9" of Lianzhou's Section A Questionnaire Response. Separate Rate Mem. at 2 n.7. Exhibit A-9 consists of letters documenting Zhejiang Juhua's appointment of Lianzhou's executive director, supervisor, and general manager; thus, there is no Article 9 therein. See Lianzhou AQR, Ex. A-9. Article 9 of Lianzhou's articles of association, however, provides for Zhejiang Juhua's appointment of Lianzhou's executive director, supervisor, and general manager. See Lianzhou AQR, Ex. A-7 at Art. 9.

Quhua's articles of association are appended to its separate rate application at Exhibit 10. Article 9 governs Zhejiang Juhua's responsibilities as sole shareholder. See Quhua SRA, Ex. 10 at Art. 9.

All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, unless otherwise stated.

Commerce made no findings regarding de jure control. See I & D Mem. at 10-16.

Plaintiffs also contend that Defendant-Intervenors have advanced several arguments supporting Commerce's determination that Commerce itself did not rely upon. Pls.' Reply at 7-8 (citing Def.-Ints.' Resp. at 4, 11-19). It is well settled that the court may only sustain the agency's decision "on the same basis articulated in the order by the agency itself." Burlington Truck Lines, Inc. v. United States , 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Accordingly, the court limits its consideration to the grounds advanced by Commerce.

The affirmance is nonprecedential. See Fed. Cir. Rule 32.1(b).

By issuing a redetermination under protest, Commerce signals its disagreement with the court's opinion and preserves its right to appeal. See Meridian Prods. v. United States , 890 F.3d 1272, 1276 n.3 (Fed. Cir. 2018) (citing Viraj Grp., Ltd. v. United States , 343 F.3d 1371, 1376 (Fed. Cir. 2003) ).

An Giang II represents the court's opinion following the remand ordered in An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States ("An Giang I "), 41 CIT ----, ----, 203 F.Supp.3d 1256 (2017).

The court addresses Plaintiffs' assertion that Commerce has effectively rendered the presumption "irrebuttable" infra , pp. 1323-24.

Plaintiffs assert that, since 1994, Commerce has granted exporters a separate rate despite "significant-and even 100 percent-government ownership." Pls.' Mem. at 18-19 (citations omitted). In the only cited determination that post-dates the AT & M litigation, the government held a minority stake in the relevant entity. See Issues and Decision Mem. for the Admin. Review of the Antidumping Duty Order on Small Diameter Graphite Electrodes from the PRC; 2014-2015, A-570-929 (Sept. 2, 2016) at 18-19, available at https://enforcement.trade.gov/frn/summary/prc/2016-21782-1.pdf (last visited Oct. 4, 2018).

Article 199 of Zhejiang Juhua's articles of association sets forth rules governing dissolution in the event of Zhejiang Juhua's liquidation; thus, its relevance to Plaintiffs' argument is unclear. See Zhejiang Juhua Arts. of Assoc., Art. 199.

Plaintiffs' reference is to Article 82; however, their discussion suggests that this reference is a typographical error and they intended to refer to Article 86. See Pls.' Mem. at 29. Article 82 is discussed below. See infra , note 21 and accompanying text.

Plaintiffs seek to rely on additional provisions of the Corp. Code Circular to demonstrate Zhejiang Juhua's independence from Juhua Group. See Pls.' Mem. at 9-10 (citing Corp. Code Circular, Arts. 22-27). While these provisions may demonstrate de jure autonomy, the issue here is de facto control, which the cited provisions fail to rebut.

Cumulative voting
allows shareholders to cast all of their votes for a single nominee for the board of directors when the company has multiple openings on its board. In contrast, in "regular" or "statutory" voting, shareholders may not give more than one vote per share to any single nominee. For example, if the election is for four directors and you hold 500 shares (with one vote per share), under the regular method you could vote a maximum of 500 shares for each one candidate (giving you 2,000 votes total-500 votes per each of the four candidates). With cumulative voting, you are afforded the 2,000 votes from the start and could choose to vote all 2,000 votes for one candidate, 1,000 each to two candidates, or otherwise divide your votes whichever way you wanted.
Quhua SRA, Ex. 7D (definition of "Cumulative Voting"); see also Zhejiang Juhua Art. of Assoc., Art. 82 (governing cumulative voting procedures).

Plaintiffs rely on Jiasheng I and Jiasheng II to support the proposition that Commerce failed to consider "the totality of the circumstances," including the de jure prong of the separate rate test and the three additional de facto criteria. Pls.' Mem. at 24-25 (citing Jiasheng I , 28 F.Supp.3d at 1339 n.160 ; Jiasheng II , 121 F.Supp.3d at 1266 ); id. at 39. In neither case, however, does the court state that Commerce must consider each criterion and prong and evaluate or weigh the exporter's relative fulfillment of each. The Jiasheng II court also recognized that Commerce's post-Diamond Sawblades practice generally precludes an exporter or producer from obtaining a separate rate when it is majority-owned by the government, either directly or indirectly. 121 F.Supp.3d at 1267.

The court decided Rongxin III following the court ordered remands in Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States ("Rongxin II "), 41 CIT ----, 203 F.Supp.3d 1327 (2017), and Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States , 40 CIT ----, 163 F.Supp.3d 1249 (2016).

Accordingly, the court does not address Plaintiffs' arguments regarding evidence demonstrating the absence of de jure control or the absence of de facto control vis-à-vis the remaining criteria. See Pls.' Mem. at 25-28.

Plaintiffs' assertion that "Juhua Group would violate the PRC Company Law if it were to appoint Zhejiang Juhua's board members," Pls.' Mem. at 38 (emphasis omitted), misses the point because Commerce made no such finding. Rather, Commerce relied upon Juhua Group's ability as majority shareholder to control "the operations of the company, including the selection of management," and its interest in so doing. I & D Mem. at 12.

Plaintiffs point to the Jiasheng I court's statement "that Commerce considers the 'totality of the circumstances' and does not rely solely on 'the possibility for governmental control over export activities.' " Pls.' Mem. at 39 (quoting Jiasheng I , 28 F.Supp.3d at 1339 n.160, 1348 ). That case, however, involved minority government ownership. Thus, evidence tracing ownership to the government did not merit the denial of a separate rate. Jiasheng I , 28 F.Supp.3d at 1349. Plaintiffs assert that An Giang I "compels remand" on the basis of the court's finding that Commerce had impermissibly relied on potential control to deny a separate rate request. Pls.' Mem. at 40 (citing An Giang I , 203 F.Supp.3d at 1291-92 ). In An Giang II , however, the court clarified the relevance of potential control in cases concerning majority and minority government control and affirmed Commerce's determination. 284 F.Supp.3d at 1359. Plaintiffs also assert that Rongxin II "compels remand" on the basis of the court's remand therein for Commerce to explain the propriety of its reliance on a respondent's failure to fulfill one de facto criterion to deny a separate rate. Pls.' Mem. at 40-41 (citing Rongxin II, 203 F.Supp.3d at 1348 ). Following remand, however, the Rongxin III court affirmed Commerce's determination that the exporter had failed to establish the absence of de facto control solely on the basis of its failure to demonstrate autonomy regarding management selection. Rongxin III , 331 F.Supp.3d at 1403-04, Slip Op. 18-107.

Defendant-Intervenors did not respond to Plaintiffs' arguments regarding the lawfulness of Commerce's determination. See Def.-Ints.' Resp. at 6-7 (presenting arguments pertaining solely to the court's substantial evidence review).

Pursuant to the bursting bubble theory, "a presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." Aukerman , 960 F.2d at 1037-38 (discussing the amount of evidence a patentee must proffer to rebut an alleged infringer's assertion that the patentee waited too long to file an infringement action).

Two opinions addressing Commerce's separate rate analysis have suggested otherwise. See An Giang II , 284 F.Supp.3d at 1362 ("A respondent may rebut th[e] presumption [of government control], unless record evidence demonstrates that the majority shareholder is controlled by the government."); Jiasheng II , 121 F.Supp.3d at 1267 (Commerce's practice "holds that ... majority ownership [ ] 'in and of itself' precludes a finding of de facto autonomy.") (citation omitted). At oral argument, however, Defendant clarified that Commerce has not taken the position that majority government ownership per se bars separate rate eligibility. Defendant posited the possibility that evidence in the form of an article of association limiting a government-owned entity from voting in accordance with its majority shareholding may compose affirmative evidence breaking the chain of control, but noted that such evidence was absent here. Oral Arg. Recording at 30:10-32:33.

Plaintiffs identify the case as "Jiansheng I "; however, the accompanying reporter volume and pin cite suggests that Plaintiffs intended to cite to Jiasheng II.